IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:17-CT-3173-M

| | |
|---|---|
| MATTHEW JAMES GRIFFIN, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | ORDER |
| ) | |
| NADINE J. BRYANT, PATRICIA M. ) | |
| MANNION, ARLENE BURGESS ) | |
| TOODLE, M.A. KHAN, MATTHEW ) | |
| JAMES BOSSIE, BYRON SCOTT ) | |
| CARTER, UNKNOWN DOE #1, and ) | |
| UNKNOWN DOE #2, ) | |
| ) | |
| Defendants.[1] ) | |

This matter is before the court on the following motions: (1) defendant Kahn's motion to dismiss [D.E. 61]; (2) defendant Bossie's motion to dismiss [D.E. 78], which the court converted to a motion for summary judgement; (3) plaintiff's motion for leave to file amended complaint [D.E. 82]; (4) defendant Kahn's second motion to dismiss [D.E. 85], which the court converted into a motion for summary judgment; (5) plaintiff's motion to strike [D.E. 92]; (6) plaintiff's motion for order requiring personal service [D.E. 99]; (6) plaintiff's motion for extension of time to serve process under Rule 4(m) [D.E. 109]; (7) plaintiff's motion for extension of time to serve the re-issued summons upon defendant Bryant [D.E. 105]; (8) plaintiff's motion for entry of default [D.E. 111]; and (9) plaintiff's motion for subpoena duces tecum [D.E. 112].

For the reasons stated below, the court grants the motions for summary judgment. The court denies plaintiff's motion to amend, motions for extension of time to serve process and motion for entry

---

[1] Defendant North Carolina Department of Public Safety ("NCDPS") was dismissed by court order on April 9, 2019. (Apr. 9, 2019, Ord. [D.E. 23] at 2-3).

of default. Defendant Khan's motion to dismiss, and plaintiff's motions to strike and for subpoena are denied as moot.

## STATEMENT OF THE CASE

On June 30, 2017, Matthew James Griffin ("plaintiff"), a state inmate proceeding pro se, filed this complaint alleging claims under 42 U.S.C. § 1983 , the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., the Rehabilitation Act, 29 U.S.C. § 794, and state law. [D.E. 1]. Plaintiff makes the following allegations: (1) defendants Bryant, Mannion, Toodle, Doe #1, Doe #2, Kahn, Carter, and Bossie were deliberately indifferent to plaintiff's medical needs in violation of the Eighth and Fourteenth Amendments; (2) defendant Bryant took retaliatory action against him for making complaints under the ADA and Rehabilitation Act; (3) defendants Bryant, Mannion, Toodle, Doe #1, Doe #2, Khan, Carter, and Bossie were negligent when they sedated plaintiff and left him unsupervised. [D.E. 1].

As relief, plaintiff seeks the following: (1) $115,200.00 for physical injuries, pain, suffering, and loss of enjoyment of life; (2) $876,000.00 for his future pain, suffering, treatment, and permanent physical injury; (3) $991,200.00 in damages under the North Carolina Tort Claims Act; (4) unspecified compensatory and punitive damages for violation of plaintiff's constitutional rights; (5) relief allowed under ADA and Rehabilitation Act; (6) other such relief that the court may deem just and equitable. [D.E. 1].

On April 9, 2019, the court granted plaintiff's motions to voluntarily dismiss his claims for monetary damages under the ADA and his state law claims, as well as dismissal of defendant North Carolina Department of Public Safety ("NCDPS"). [D.E. 23]. Plaintiff was allowed to proceed on his remaining claims against defendants. [D.E. 23].

On June 10, 2019, defendant's Carter and Burgess waived service, [D.E. 26], and the North Carolina Attorney General provided information for effecting service on defendants Bossie, Bryant,

Kahn, and Mannion, [D.E. 27]. The clerk issued summonses to defendants Bossie, Bryant, Kahn, and Mannion, [D.E. 28], and defendant Bossie was served on June 18, 2019, [D.E. 31]. Defendant Kahn was served on June 24, 2019. [D.E. 32]. The Marshals Service was unable to serve defendants Mannion and Bryant. [D.E. 52, 53].

On July 15, 2019, the court dismissed the action without prejudice for failure to advise the court of his new address and failure to prosecute. [D.E. 34]. That same day, plaintiff filed a notice of change of address. [D.E. 36]. On August 2, 2019, plaintiff appealed the dismissal of the action. [D.E. 43]. The Fourth Circuit later dismissed the appeal upon plaintiff's motion. [D.E. 55].

On October 2, 2019, the court granted plaintiff's motion to reopen the case and directed defendants Carter, Burgess, Bossie, and Kahn to answer or otherwise respond to the complaint. [D.E. 54]. Regarding defendants Bryant and Mannion, who had not yet been served, the court concluded it had fully discharged its duties under 28 U.S.C. § 1915(d) and directed plaintiff to show cause why defendants Bryant and Mannion should not be dismissed. [D.E. 54]. Plaintiff responded on October 29, 2019. [D.E. 59].

On October 30, 2019, defendant Kahn filed a motion for dismiss for failure to state a claim and a memorandum in support. [D.E. 61, 62]. On November 19, 2019, plaintiff responded in opposition. [D.E. 71]. Defendant Kahn filed a reply on November 21, 2019. [D.E. 73].

On December 2, 2019, the court granted defendants Toodle and Carter's motion for extension of time to answer and directed them and defendant Bossie to file an answer. [D.E. 75]. The court also granted, in part, plaintiff's motions relating to service on defendants Bryant and Mannion and directed the United States Marshal Service to attempt to make personal service. [D.E. 75].

On December 9, 2019, Bossie filed a motion to dismiss for failure to state a claim and for failure to exhaust administrative remedies, and a memorandum in support. [D.E. 78, 79]. On December 10, 2019, plaintiff filed a motion for leave to file an amended complaint. [D.E. 82].

3

Defendant Kahn filed a response in opposition on December 19, 2019. [D.E. 88]. On January 3, 2020, defendant replied. [D.E. 93].

On December 16, 2019, defendant Kahn filed a second motion to dismiss for failure to exhaust administrative remedies and a memorandum in support. [D.E. 85, 86]. The court granted plaintiff an extension to respond to both defendant Bossie and Kahn's motions to dismiss. [D.E. 91]. On December 22, 2019, the Marshals Service was successful in serving defendant Bryant. [D.E. 103].

On January 3, 2020, plaintiff filed a motion to strike Bossie's first motion to dismiss and Kahn's second motion to dismiss. [D.E. 92]. On January 9, 2020, plaintiff filed a response to both motions to dismiss. [D.E. 95]. On January 23, 2020, Kahn filed a response opposing plaintiff's motion to strike. [D.E. 98]. Plaintiff replied on January 31, 2020. [D.E. 100].

On January 27, 2020, plaintiff filed a motion for an order requiring personal service on defendants Bryant and Mannion.[2] [D.E. 99]. On January 31, 2020, the summons for Mannion was returned unexecuted.[3] [D.E. 101]. On February 4, 2020, plaintiff filed a motion for extension of time to serve defendants Bryant and Mannion.[4] [D.E. 109]. On February 21, 2020, a summons was returned executed as to defendant Bryant indicating that Bryant was served on December 22, 2019. [D.E. 103].

On February 26, 2020, the court filed a notice directing plaintiff to proceed in accordance with Rule 55 of the Federal Rules of Federal Civil Procedure defendant Bryant's failure to answer. [D.E. 104]. The next day, February 27, 2020, plaintiff filed a motion for extension of time to serve the re-issued summons upon defendants Bryant and Mannion, and a declaration of support. [D.E. 105, 106].

---

[2] As previously noted, Bryant had been successfully served. [D.E. 103].

[3] The United States Marshal Service had attempted personal service, but Mannion was no longer at the given address and there was no forwarding address. [D.E. 101].

[4] However, as stated above, defendant Bryant had already been successfully served.

4

On March 10, 2020, plaintiff filed a motion for entry of default regarding defendant Bryant's failure to answer. [D.E. 111]. That same day, plaintiff also filed a motion for subpoena duces tecum directed toward the Tennessee Board of Nursing requesting the current home and work addresses for defendant Mannion. [D.E. 112]. On July 2, 2020, plaintiff filed a proposed order addressing following: (1) defendant Kahn's first motion to dismiss; (2) Bossie's motion to dismiss; (3) plaintiff's motion to amend his complaint [D.E. 82]; and (4) defendant Kahn's second motion to dismiss. [D.E. 114].

On September 5, 2020, the court entered an order converting defendant Bossie's motion to dismiss [D.E. 78] and defendant Kahn's second motion to dismiss [D.E. 85] into motions for summary judgment. [D.E. 116]. The court further directed plaintiff to file any response, including any additional exhibits, no later than September 25, 2020. [D.E. 116].

On September 22, 2020, plaintiff filed a motion for extension of time to file a response [D.E. 119], and the court granted the motion that same day, directing him to file his response by October 9, 2020, [D.E. 120].

On October 7, 2020, plaintiff filed a statement of facts in opposition to defendant Bossie and Kahn's motions to dismiss, which the court converted into summary judgment motions. [D.E. 121]. Two days later, October 9, 2020, plaintiff filed objections to the motions, [D.E.122], and a response in opposition, [D.E.123]. On October 13, 2020, plaintiff filed a second proposed order again addressing: (1) defendant Kahn's first motion to dismiss; (2) Bossie's motion to dismiss; (3) plaintiff's motion to amend his complaint; and (4) defendant Kahn's second motion to dismiss. [D.E. 126].

## STATEMENT OF FACTS

The facts, viewed in the light most favorable to plaintiff, may be summarized as follows.[5] Plaintiff is a former North Carolina state inmate. (Compl. [D.E. 1] at 6-7). He is currently a state inmate incarcerated in New Mexico. (Id. at 6-7). The conduct related to the current allegations occurred while plaintiff was incarcerated in Central Prison in Raleigh, North Carolina. (Id. at 6-7). Plaintiff is handicapped within the meaning of the ADA and Rehabilitation Act. (Id. at 7). He has a vision impairment called strabismus with extropia, which causes double vision, involuntary eye movement, a reduction in the visual field, involuntary nystagmus, eye fatigue, and loss of all depth perception. (Id. at 8). Plaintiff was diagnosed with his eye condition by ophthalmologist V.X. Manjunath, M.D., on November 9, 2015. (Id. at 9).

On November 22, 2015 and October 28, 2016, prison officials issued plaintiff a medical duty status form. (Id. at 9; Pl.'s Ex. [D.E. 1-1] at 4). Plaintiff was limited to the following limitations: bottom bunk assignment, handicapped cell assignment, no climbing, fall preventions, no heights over two feet, no stairs, no work around hazardous machinery, sharp objects, or hot objects, no driving, no uneven terrain, eye glasses, eye-patch. (Compl. [D.E. 1] at 8; Pl.'s Ex. [D.E. 1-1] at 2, 4; ).[6] His impairments affect plaintiff's abilities to: ambulate, read, work, drive, perform manual tasks involving hand-eye coordination, and perceive his surroundings. (Compl. [D.E. 1] at 9).

The same day the first medical duty status form was issued, November 22, 2015, plaintiff was removed from being housed in the general population because of the stairs in that area. (Id. at 9).

---

[5] The following factual summary is taken from plaintiff's verified complaint, filed June 30, 2017, and exhibits attached thereto. See Goodman v. Diggs, 986 F.3d 493, 498 (4th Cir. 2021) ("[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge," and "a later filed complaint does not strip a verified complaint of its value as an affidavit.").

[6] The medical duty status form dated November 22, 2015 indicates a start date for his glasses of October 9, 2015. (Pl.'s Ex. [D.E. 1-1] at 4). The restrictions to a bottom bunk, no climbing, and "other" limitations have no start date but indicate an expiration date of November 20, 2016, and December 31, 2016. (Id.). The medical duty status form dated October 28, 2016 again indicates a general start date of October 9, 2015 and a start date of January 11, 2016 for plaintiff's eye-patch. (Id. at 2). The second form also indicates an expiration date of July 11, 2017 for the following restrictions to: a bottom bunk, a handicapped cell, no climbing, fall prevention, Orderly Assistance. (Id.).

6

For example, in general population, plaintiff would need to use the stairs to access: daily meals, showering, canteen recreation, and dispensation of prescription medication. (Id. at 10). Despite a medical duty status order limiting plaintiff to fall prevention from October 9, 2015 to November 22, 2015, plaintiff was required to use stairs, and he had been from repeatedly stumbling and falling on stairs. (Id.).

After plaintiff was removed from the general population, he was placed in an emergency room holding cell in Central Prison's hospital. (Id. at 11). On November 25, 2015, the chief medical officer, O. Metiko, M.D., met with plaintiff and informed him that he was not considered a patient in Central Prison's hospital. (Id.). Dr. Metiko additionally explained that the warden had directed that plaintiff was assigned to the hospital for security purposes, and he could not leave until an ADA cell became available. (Id.).

The same evening plaintiff was transferred to the hospital, a lieutenant on the prison staff ordered that plaintiff and several other inmates be transferred away from the emergency room. (Id. at 12). This was despite the fact that plaintiff's medical duty status forms indicated that a transfer hold was in effect directing: "Do not transfer offender for Medical Reason." (Id. at 12; Pl.'s Ex [D.E. 1-1] at 4).

Plaintiff was transferred into the hospital's mental health segregation unit, which houses some of the state's most violent and disruptive mentally ill prisoners. (Compl. [D.E. 1] at 12). There, he was not housed in an ADA compliant cell, although there were compliant unoccupied cells. (Id.). Plaintiff objected to being confined in this unit because, even though he had physical impairments, he had no mental impairments. (Id. at 14).

From late at night on November 25, 2015 to the early morning of November 26, 2015, plaintiff repeatedly woke up nurses to summon them to his cell to request an explanation "as to why he was not housed within an ADA cell. . . and why he had not been returned to the ER where the warden ordered

7

him held or transferred to a general population portion of the hospital." (Id.). Medical staff and prison security repeatedly instructed plaintiff to stop disturbing them because the staff was trying to sleep. (Id. at 15).

During the night of November 26, 2015, defendants Bryant, Mannion, Toodle, Carter, Bossie, Doe #1, and Doe #2 each met with plaintiff and refused to transfer him to an ADA compliant cell with handrails. (Id.). Each also refused to return plaintiff to the ER holding cell. (Id.). Although plaintiff showed these defendants his paperwork supporting his appropriate accommodations, specifically for fall prevention, they still refused to move him. (Id. at 15-16). These defendants also verbally acknowledged that they were aware that plaintiff was not a patient in the mental health unit and that he was a general population inmate. (Id. at 16). Furthermore, defendants knew plaintiff was in the hospital solely because of his visual impairments. (Id. at 16). These defendants, except for defendant Bossie, instructed plaintiff not to wake them. (Id.). Defendant Bossie more specifically instructed plaintiff not to wake up officers or nurses because they work long hours and need rest. (Id. at 16).

At approximately 9:00 p.m. that same night, defendant Bryant noted in plaintiff's medical record that plaintiff was identified as a general population and security assigned inmate. (Id. at 17). Defendant Bryant also informed plaintiff, "My nurses and I all have a life beyond our work here – in order to enjoy that life[,] we need to get some sleep," and "[i]f you continue to wake us up to complain about the ADA[,] I'm going to have you involuntarily medicated." (Id.).

Plaintiff continued to complain to defendants Bryant, Mannion, Toodle, Doe #1, Doe #2, Carter, and Bossie that he had not received reasonable accommodations and object to his placement in mental health segregation. (Id. at 17-18). Plaintiff also continued to summon defendants, even as they slept. (Id.).

8

On November 27, 2015, at approximately 1:00 a.m., defendant Bryant obtained an emergency medical order from defendant Kahn to involuntarily sedate plaintiff with Ativan even though defendant Kahn understood plaintiff was not a patient in the hospital and had never before examined plaintiff. (Id. at 18-19). Plaintiff did not give informed consent to be sedated. (Id. at 18). Moreover, defendant Khan was aware that plaintiff had not been charged with a rules violation and no medical records justified involuntary medication and sedation. (Id. at 19).

At approximately 1:30 a.m., defendants Bryant, Mannion, Toodle, Doe #1, Doe #2, Carter, and Bossie again approached plaintiff's cell. (Id. at 20). Defendant Bryant instructed plaintiff that he was going to be transferred to an ADA cell, but due to the late hour, he would have to be placed in wrist restraints. (Id.). Plaintiff was placed in wrist restraints through an opening in the cell door, and once the door opened, defendants Doe #1, Doe #2, and Carter forced him to the ground. (Id.). Plaintiff's pants were pulled down, and he was given a shot of Ativan. (Id.). Throughout the ordeal, plaintiff continued to state, "I do not consent to any medical treatment." (Id.).

After the fact, defendants Bossie, Carter, and Doe #2 failed to fill out a "use of force" form. (Id. at 21). At 1:45 a.m., defendant Bryant generated a medical encounter, backdated to 12:58 a.m., in which she stated that she counseled plaintiff on "safety and self[-]injury," and that he was kicking his cell door and attempting to break a table. (Id.). She further claimed that no force was used. (Id.). Defendant Bryant's report was fabricated. (Id.).

In fact, plaintiff was never treated for self-injury and never received any misconduct reports before he was forcibly medicated. (Id. at 22). Defendant Bryant admitted to obtaining the emergency order prior to involuntarily medicating plaintiff and prior to providing plaintiff a counseling session. (Id.). Further, medical records indicate that, as of 1:45 a.m., plaintiff was calm and resting in his cell. (Id.).

9

Defendants Bryant, Mannion, Toodle, Doe #1, Doe #2, Carter, Kahn, and Bossie were aware that plaintiff had been administered a powerful sedative. (Id. at 22-23). They were also aware that plaintiff was under a fall precaution due to his vision. (Id.).

At approximately 2:15 a.m., on November 27, 2015, plaintiff stumbled and fell striking his head and dislocating his left shoulder. (Id.). Plaintiff pushed the emergency call button, but no one responded. (Id.). At approximately 3:00 a.m., staff discovered him lying on the cell floor. (Id.). Plaintiff advised defendants Bryant, Mannion, Toodle, Doe #1, Doe #2, and Carter that his left shoulder was dislocated, but defendants refused to provide him medical care. (Id. at 23-24). Defendant Bryant also told him that if he did not stop complaining, he would receive another sedative. (Id.).

Plaintiff again began pressing the emergency button in his cell. (Id.). Defendants Bryant, Mannion, Toodle, and Doe #1 laughed at him. Defendants Bryant and Mannion informed him that the call buttons had been disconnected. (Id.). Defendants Bryant, Mannion, Toodle, Doe#1, Doe #2, and Carter then left plaintiff in his cell with a dislocated shoulder. (Id. at 24-25). Plaintiff reduced his own shoulder without medical help. (Id. at 25).

A doctor did not treat plaintiff until December 4, 2015, when he took x-rays and referred plaintiff to an orthopedic specialist. (Id.). It was not until January 25, 2016, that plaintiff was seen by an orthopedic specialist, Dax T. Varkey, M.D., who diagnosed plaintiff with bilateral shoulder dislocations, one occurring in November 2015 and the other in 2012. (Id.). Dr. Varkey also noted that plaintiff had a left shoulder impingement and dysfunction. (Id. at 26). He recommended pain medication, physical therapy, and for wrist restraints to be worn at the front of plaintiff's body. (Id.). Plaintiff received physical therapy in 2016 and 2017. (Id.). From November 27, 2015 to June 25, 2017, plaintiff experienced moderate to severe pain in his left shoulder. (Id.).

10

Plaintiff filed a grievance in accordance with NCDPS policy, but it was "delayed" because, according to policy, plaintiff could only file a certain number of grievances at a time. (Id. at 27). His grievance was ultimately rejected because more than 90 days had elapsed since the incident. (Id.).

COURT'S DISCUSSION

I. Motion to Amend Complaint, [D.E. 82]

Pursuant to Federal Rule of Civil Procedure 15(a), prior to trial, a court should freely grant leave to amend a complaint unless "the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would [be] futile." Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (en banc) (quotation omitted); see also Johnson v. Oroweat Foods Co., 785 F.2d 503, 510 (4th Cir. 1986) ("Leave to amend, however, should only be denied on the ground of futility when the proposed amendment is clearly insufficient or frivolous on its face."). "A proposed amendment is futile when it is clearly insufficient or frivolous on its face" or "if the claim it presents would not survive a motion to dismiss." Save Our Sound OBX, Inc. v. N.C. Dep't. of Transp., 914 F.3d 213, 228 (4th Cir. 2019) (internal quotations and citations omitted).

Here, plaintiff's proposed amendment provides additional facts and causes of action but largely reiterates the claims plaintiff addressed in his original complaint. (Compare Compl. [D.E. 1] at 7-37, and Proposed Am. Compl. [D.E. 82-1] at 8-31). Specifically, plaintiff seeks to correct the names of defendants and to clarify pertinent facts regarding defendant Khan's role in prescribing plaintiff a sedative. (Mot. Am. [D.E. 82] at 2, 15-16). Plaintiff also seeks to add supplementary claims that defendants (1) deprived plaintiff of his liberty in violation of the due process clause of the Fifth and Fourteenth Amendments of the United States Constitution, and (2) committed the torts of assault and battery under North Carolina law. (Id. at 27, 31).

11

As explained below, the instant action is dismissed because plaintiff failed to exhaust his administrative remedies. The proposed amendments do not cure plaintiff's failure to exhaust. Therefore, plaintiff's motion to amend is futile. See Dolgaleva v. Va. Beach City Pub. Sch., 364 F. App'x 820, 824 (4th Cir.2010) (denying motion to amend as futile for failure to exhaust administrative remedies); Gamez-Gonzalez v. United States, No. 4:14-2668-JMC-TER, 2017 WL 3084488, at *4 (D.S.C. May 17, 2017) (denying motion to amend as futile where the amendment would not cure the plaintiff's failure to exhaust administrative remedies), report and recomm. adopted by Gamez-Gonzalez v. United States, 2017 WL 3067974 (D.S.C. July 19, 2017); Daso v. Grafton School, Inc., 181 F. Supp. 2d 485, 489, 90 (D. Ma. Jan. 24, 2002) (same).

Accordingly, plaintiff's motion to amend is DENIED as futile.

II.     Motion for Entry of Default [D.E. 111]

The court now turns to plaintiff's motion for entry of default and default judgment as to defendant Bryant. Federal Rule of Civil Procedure 55(a) provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Here, plaintiff filed the motion for entry of default seven days after defendant Bryant filed her answer. (See Bryant's Answer [D.E. 110]). Because defendant Bryant did not fail to plead or otherwise defend, entry of default is not appropriate under Rule 55(a). Accordingly, plaintiff's motion for entry of default is DENIED.

III.    Defendants Bossie and Kahn's Motions to Dismiss [D.E. 78, 85] – Converted to Motions for Summary Judgment

   a.)  Legal Standard

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48

12

(1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

b.) Discussion

Defendants Khan and Bossie argue, in part, that plaintiff failed to exhaust administrative remedies with respect to his claims.

The Prison Litigation Reform Act ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement also applies to claims made under the ADA and Rehabilitation Act. See O'Guinn v. Lovelock Corr. Ctr., 502 F.3d 1056, 1060–61 (9th Cir. 2007) (holding that the PLRA requires exhaustion of administrative remedies before an action may be brought under any federal law, including the ADA and Rehabilitation Act); Corpening v. Hargrave, No. 5:14-CV-122-FDW, 2015 WL 3832551, at *4 (W.D.N.C. June 22, 2015).

Exhaustion is mandatory, and the court therefore may not excuse failure to exhaust, even to take special circumstances into account. Ross v. Blake, 136 S. Ct. 1850, 1856 (2016); Woodford v. Ngo, 548 U.S. 81, 83-85 (2006). Administrative grievances must contain sufficient detail to "alert[]

13

the prison to the nature of the wrong for which redress is sought" and "give prison officials a fair opportunity to address the alleged [mistreatment]." Wilcox v. Brown, 877 F.3d 161, 167 n.4 (4th Cir. 2017) (quoting Strong v. David, 297 F.3d 646, 650 (7th Cir. 2002)); Moore v. Bennette, 517 F.3d 717, 726 (4th Cir. 2008).

The only exception to mandatory exhaustion is when the administrative remedy procedure is unavailable to the inmate. See 42 U.S.C. § 1997e(a); Ross, 136 S. Ct. at 1858-60. An administrative remedy process is unavailable if: 1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; 2) when it is "so opaque that it becomes, practically speaking, incapable of use"; and 3) where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross, 136 S. Ct. at 1858-60.

NCDPS has a three-step administrative remedy procedure. (NCDPS Administrative Remedy Procedure "ARP" [D.E. 79-2] § .0310); see also Moore, 517 F.3d at 721. NCDPS's procedure first encourages inmates to attempt informal communication with responsible authorities at the facility. (ARP [D.E. 79-2] § .0301(a)). If informal resolution is unsuccessful, the ARP provides that inmates may submit a written grievance. (Id. § .0310(a)). If the inmate is not satisfied with the decision reached at the step-one level of the grievance process, he may request relief from the facility head. (Id. § .0310(b)(1)). If the inmate is not satisfied with the decision reached by the facility head, he may then appeal his grievance to the Secretary of Public Safety. (Id. § .0310(c)(1)). The decision by the inmate grievance examiner or a modification by the Secretary of Public Safety is the final step procedure. (Id. § .0310(c)(6)).

In the instant case, defendants Khan and Bossie submit undisputed evidence that plaintiff failed to exhaust administrative remedies prior to filing this action. (See Bossie's Mot. Dismiss, Exhibit B [D.E. 79-3]). The record further indicates that plaintiff has exhausted administrative remedies in

14

many of the grievances he has previously filed with NCDPS, demonstrating that plaintiff is very familiar with the grievance process. (See e.g., id. at 2, 6, 15, 32, 39, 57, 67, 72, 93, 100, 106, 117, 121, 128). However, there is no grievance pertaining to the relevant claims demonstrating that plaintiff completed the three-step administrative remedy procedure.

Plaintiff does not contest that he failed to exhaust administrative remedies before filing his original complaint in this action. (See Compl. (DE 1) 27-28). Plaintiff instead argues that the NCDPS administrative remedy procedure was unavailable to him where his grievance was rejected because he had an additional active grievance already pending. (Id.). NCDPS's rule that plaintiff may only pursue one grievance at a time does not render the procedure unavailable under the standard set forth above. The rule does not make the NCDPS procedure operate as a dead end, render it exceedingly opaque, or provide an avenue for prison officials to thwart inmates from taking advantage of the grievance process. See Ross, 136 S. Ct. at 1860; Moore, 517 F.3d at 729-30 (concluding plaintiff failed to exhaust administrative remedies where prison officials rejected grievance based on rule that only one grievance can be pending at a time); see also Turner v. Clelland, No. 1:15-CV-947, 2016 WL 6997500, at *11 (M.D.N.C. Nov. 30, 2016). Accordingly, plaintiff's argument that the NCDPS administrative remedy procedure was unavailable is without merit.

In sum, plaintiff failed to exhaust available administrative remedies regarding the claims put forth in the instant cause of action. Accordingly, the court DISMISSES WITHOUT PREJUDICE plaintiff's claims pursuant to 42 U.S.C. 1983, the ADA, and the Rehabilitation Act.

IV.   Remaining State Law Claims

Because the court dismisses all of plaintiff's federal causes of action, the court declines to exercise supplemental jurisdiction over any asserted state-law claims. See 28 U.S.C. § 1367(c)(3)

15

(granting courts discretion to decline to exercise supplemental jurisdiction over a pendent State claim where the court has dismissed all claims over which it has original jurisdiction); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) (noting that "pendent jurisdiction is a doctrine of jurisdictional discretion" and that, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well"); Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 617 (4th Cir. 2001) (holding the district court possesses "inherent power to dismiss the case ... provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met").

## CONCLUSION

Based on the foregoing, the court decides as follows:

a.) the motions to dismiss, construed as motions for summary judgment, [D.E. 78, 85] filed by defendants Bossie and Khan are GRANTED, and plaintiff's claims are DISMISSED WITHOUT PREJUDICE;

b.) plaintiff's motions for leave to amend [D.E. 82] and for entry of default [D.E. 111] are DENIED;

c.) defendant Khan's motion to dismiss [D.E. 61] and plaintiff's motion to strike [D.E. 92], motions regarding personal service [D.E. 99, 105, 109], and motion for subpoena [D.E. 112] are DENIED AS MOOT; and

d.) the clerk is DIRECTED to close the case.

SO ORDERED, this the 26th day of March, 2021.

RICHARD MYERS, II
Chief United States District Judge